IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

ORLANDO CORCHO,

            Petitioner,

vs.                              **Case No. 07-4037-RDR**

MICHAEL J. ASTRUE,
Commissioner of Social
Security,

            Respondent.

## MEMORANDUM AND ORDER

This is an action to review a final decision by the Commissioner of Social Security regarding plaintiff's entitlement to disability insurance benefits and supplemental security income (SSI) benefits under the Social Security Act. The parties have briefed the relevant issues and the court is now prepared to rule.

I.

Plaintiff filed an application for disability benefits on April 17, 2003 and an application for SSI benefits on June 10, 2003, with a protective filing on May 2, 2003. He alleged that his disability began on September 15, 2002. Plaintiff's application was denied initially and on reconsideration by the Social Security Administration (SSA). A hearing was ultimately conducted by an administrative law judge (ALJ) on plaintiff's application. On August 22, 2006, the ALJ determined in a written opinion that plaintiff was not entitled to disability or SSI benefits. On January 19, 2007 the Appeals Council of the SSA denied plaintiff's

request for review.  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

II.

The court reviews the Commissioner's decision to determine whether the decision was supported by substantial evidence and whether the correct legal standards were applied.  <u>Glenn v. Shalala</u>, 21 F.3d 983, 984 (10th Cir. 1994).  Substantial evidence is such evidence that a reasonable mind might accept to support the conclusion.  <u>Rebeck v. Barnhart</u>, 317 F.Supp.2d 1263, 1271 (D.Kan. 2004) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). The court must examine the record as a whole, including whatever in the record fairly detracts from the weight of the Commissioner's decision, and on that basis decide if substantial evidence supports the Commissioner's decision.  <u>Glenn</u>, 21 F.3d at 984.

The Commissioner has established a five-step sequential evaluation process to determine if a claimant is disabled.  <u>Reyes v. Bowen</u>, 845 F.2d 242, 243 (10th Cir. 1988).  If a claimant is determined to be disabled or not disabled at any step, the evaluation process ends there.  <u>Sorenson v. Bowen</u>, 888 F.2d 706, 710 (10th Cir. 1989).  The burden of proof is on the claimant through step four; then it shifts to the Commissioner.  <u>Id</u>.

III.

Plaintiff was born on May 5, 1954.  Plaintiff has completed the ninth grade.  He has previously worked as a hand packager, a

hardware assembler, a machine operator and a salvage laborer.

The medical evidence in the record begins in July 2002. At that time, plaintiff was admitted to the hospital due to swollen feet and bilateral lower extremity edema. At admission, he noted that he had a history of 1½ years of uncontrolled blood pressure. His blood pressure at that time was 205/123. A chest x-ray was performed. It showed slight pulmonary edema with some small bilateral pulmonary effusions as well as an enlarged heart. An echo test showed left and right atrial enlargement in addition to an ejection fraction of 15% to 20%. Other tests revealed no abnormalities. Plaintiff was released and given several medications to control his blood pressure. He was also given additional medication for his lower extremity edema, which at the time of discharge was much improved.

Plaintiff was seen in a follow-up examination by Jayesh H. Thaker, M.D., on July 30, 2002. Plaintiff stated he felt much better. His ejection fraction was 20%. Dr. Thaker increased one of plaintiff's medications and continued the others. He found that plaintiff's blood pressure remained slightly elevated.

Plaintiff was thereafter treated by Billy D. Richardson, M.D. He was first seen by Dr. Richardson on April 10, 2003. Plaintiff's blood pressure had increased to 226/130, but he refused hospitalization. Plaintiff was seen again on May 2, 2003, and May 22, 2003 for hypertension. On May 22, 2003, plaintiff complained

of painful walking for the past two years.

On June 18, 2003, Dr. Richardson reported that plaintiff's blood pressure was better.  On the same day, Thaju Salam, M.D., reviewed an echocardiogram and diagnosed plaintiff with dilated cardiomyopathy with a moderate decrease in ejection faction of 35%.  Dr. Richardson noted the following on Dr. Salam's report:  "Better than we thought but not great."

Plaintiff was seen again by Dr. Richardson on July 24, 2003.  At that time, plaintiff reported that he "feels well."  Dr. Richardson diagnosed plaintiff with hypertension and dilated cardiomyopathy.  On September 19, 2003, plaintiff complained that his legs hurt, he had no energy, he was not sleeping, and he had difficulty rising from a sitting position.  Dr. Richardson diagnosed fatigue, hypertension and cardiomyopathy.  On September 22, 2003, plaintiff indicated that he felt better.  His blood pressure was better as it measured 160/80.

On October 13, 2003, plaintiff reported he felt a little better but coughed a lot and had difficulty sleeping.  Dr. Richardson diagnosed depression and dilated cardiomyopathy.  Plaintiff complained of being tired occasionally on November 17, 2003.  Plaintiff, however, indicated that he felt better.  Dr. Richardson noted that plaintiff's spirit was up.  He was diagnosed with depression.

A consultative psychological examination was performed by

Stanley Mintz, Ph.D., on January 6, 2004. At that time, plaintiff presented his problems as follows:

> Mr. Corcho reports medical conditions including high blood pressure, heart condition, kidney condition, swelling of the feet, "water on my body" and also depression. He notes concerning depression he has been depressed for about a year, he has difficulty sleeping, he is fatigued "all the time." Mr. Corcho further notes that he cries about twice a day on average and he notes "I feel like I could do nothing right." He explains he was a machine operator, he has been out of work for a year because of medical conditions and fatigue, breathing problems, chest pain, he notes "it hurts me to tie my shoes." He worked in Missouri, he notes no prior history of mental illness and no history of treatment for mental illness. Mr. Corcho also notes he is somewhat socially withdrawn at this time, he has given up many of his friends, he lives with his girlfriend, he has lived with her for about 17 years and she is medically disabled.

Dr. Mintz concluded that plaintiff was capable of relating well to co-workers and supervisors. He further noted that plaintiff appeared to understand simple and intermediate instructions and his concentration capacity appeared intact. He also indicated that plaintiff was capable of handling his own funds. He diagnosed plaintiff with adjustment disorder with depressed mood. He assigned plaintiff a Global Assessment of Functioning of 60 (indicative of moderate symptoms or moderate difficulty in social, occupational or school functioning).

Dr. Richardson saw plaintiff twice in January 2004. On both occasions, plaintiff complained of being tired. Plaintiff noted on the second visit that he felt better. Dr. Richardson diagnosed depression and cardiomyopathy.

On January 28, 2004, Steven Owens, M.D., saw plaintiff with complaints of chest discomfort. Dr. Owens indicated that plaintiff had a history of cardiomyopathy which had improved with medical therapy. He opined that plaintiff's chest discomfort suggested angina, and he noted a history of alcohol abuse that might relate to the heart condition. Dr. Owen recommended a heart catheterization.

A left heart catheterization was performed by Edward J. Laughlin, M.D., on February 10, 2004. Dr. Laughlin found an ejection fraction of 55%. He further noted that the right dominant coronary anatomy was completely normal without any significant obstructive disease or even any plaque. Dr. Owens found that the previous cardiomyopathy had been substantially resolved but that plaintiff had some mild left ventricular diastolic dysfunction likely related to hypertension. Dr. Owens stated that ongoing treatment for the hypertension would be important. He recommended plaintiff follow up with Dr. Richardson for a "lung work-up."

Dr. Richardson saw plaintiff again on February 20, 2004 when plaintiff indicated that he felt well. Dr. Richardson stated that the cardiomyopathy had been resolved and indicated that plaintiff could increase his activity and return in three months.

On April 12, 2004, James D. Haug, M.D., examined plaintiff's eyes. Plaintiff indicated that he was involved in a car accident in 1975 which required surgery on his left eye. He wore over-the-

counter glasses for reading. His uncorrected visual acuity was 20/80 in both eyes. With correction, plaintiff's visual acuity in the right eye was 20/40. Dr. Haug indicated that plaintiff had bilateral pterygium, the pterygium in the left eye was visually significant. He recommended that plaintiff undergo removal of the pterygia. Dr. Haug performed a pterygium excision in the plaintiff's left eye and a conjunctival transplant on May 19, 2004. After the surgery, he stated that there was good expectation of improvement in plaintiff's vision. Plaintiff stated his vision was "so-so" on May 27, 2004. Dr. Haug examined plaintiff again on July 29, 2004. At that time, plaintiff told Dr. Haug that his eye felt good and he had no problems. Dr. Haug determined that the pterygium removal was adequate.

Plaintiff continued to see Dr. Richardson through 2004 for various problems, most of which were minor in nature. Dr. Richardson prepared a medical source statement on June 29, 2004. In that statement, he indicated that plaintiff could lift five pounds occasionally and frequently. He further stated that plaintiff could stand or walk for less than 15 minutes continuously and for less than an hour during an eight-hour day. He also stated that plaintiff could sit for 45 minutes continuously and for six hours in an eight-hour day. Plaintiff could never climb, balance, stoop, bend, kneel, crouch, crawl, reach, handle, finger, feel or grip. Dr. Richardson opined that plaintiff should avoid exposure

to extreme cold, heat, weather, wetness/humidity, dust/fumes, vibrations, hazards and heights.

On December 21, 2004, plaintiff told Dr. Richardson that he felt well and had no new complaints. Dr. Richardson completed another assessment on May 10, 2005. He determined that plaintiff had "Class 2 cardiac functional capacity." He indicated that plaintiff could not perform strenuous labor, walking, running or lifting. He noted that plaintiff's last medical appointment was December 21, 2004, and that he should continue current treatment. He did believe that plaintiff's condition had stabilized so he could participate in an employment or training program.

Plaintiff returned to Dr. Richardson on January 30, 2006 with cold symptoms. Dr. Richardson completed another assessment on March 26, 2006. He indicated that plaintiff could lift less than five pounds occasionally and frequently, stand or walk for less than 15 minutes continuously and three hours in a day, sit for 15 minutes continuously and two hours in a day, and could never crawl and climb. He could occasionally balance, stoop, bend, kneel, crouch, reach, handle, finger, feel and grip. Plaintiff had to avoid any exposure to extreme cold, extreme heat, dust/fumes, hazards, heights, and moderate exposure to weather, wetness/humidity and vibrations. Dr. Richardson stated that plaintiff needed to lie down or recline 10 times a day for 15 minutes at a time to alleviate his pain or fatigue.

On April 18, 2006, plaintiff was examined by Wayne E. Spencer, M.D. Plaintiff reported that he had been off medical therapy for about a year because of lack of funds for the medications. He described his current symptoms as tightness in the chest, edema that accumulates throughout the day, and dyspnea on exertion. He estimated that he could walk about one and a half blocks, but he has to do so slowly. Plaintiff stated that he had been depressed for the last two and a half years, but his medication helped when he was taking it. Dr. Spencer diagnosed plaintiff with cardiomyopathy, likely secondary to chronic hypertension. He noted that plaintiff's history would suggest that he has a significant disease with only borderline compensation. He also found that plaintiff had a history of hypertension and depression. Dr. Spencer indicated that his assessment of plaintiff's ability to do work-related activities was based largely on plaintiff's medical history and not upon the examination. He found that plaintiff could lift 20 pounds occasionally and 10 pounds frequently. He stated that plaintiff could stand or walk for less than two hours a day, but that sitting was not impaired. Dr. Spencer indicated that plaintiff could never climb, kneel, crouch or crawl but could occasionally balance and stoop. He noted that these postural maneuvers would be limited by a medical history of exertional dyspnea and chest pain. Reaching, handling, fingering and feeling were unlimited. Dr. Spencer stated that pulmonary cardiovascular

problems could possibly cause limits in exposure to temperature extremes, dust, humidity/wetness, hazards and fumes.

At the hearing before the ALJ, plaintiff testified that he was 51 years old and had completed the ninth grade. He last worked in 2003. As a paint mixer, he lifted 10 pounds or more. He stated that as a machine operator he occasionally lifted 12 pounds. There was not much lifting as a packager and none as a brick maker.

Plaintiff indicated that he had problems with his heart and his feet. Plaintiff testified that he had undergone two heart surgeries and he did not go back to work after them. Plaintiff testified that Dr. Richardson told him that he could work and that he would give him medication. Plaintiff suggested that his heart problems caused him difficulty in breathing. He also noted problems with swelling in his legs, dizziness and tiredness. He stated that he could only sleep two hours a night due to chest pain and breathing problems, and he did not sleep during the day.

Plaintiff testified that he could stand for one to two hours without a break, but would then have to sit down for 45 minutes to an hour to relieve the pain. He said his ability to sit was not affected but that it hurt a little bit. Plaintiff then stated that sitting did not cause swelling in his feet, but he could only sit for two to four hours due to kidney pain. He could walk 200 meters but then he would have to sit for 20 to 40 minutes because of chest pain. Plaintiff testified that he could lift five pounds but had

not tried to lift anything heavier. Bending, crouching and crawling caused pain in his legs and heart.

Plaintiff indicated that his activities around the house were very limited. He indicated that he suffered chest discomfort when he did ordinary household duties. He was able to cook, lift pots and pans, and do cleaning chores. He was able to drive, but he did not have a car. During the day he sat in the house, watched television, cleaned the house and washed clothes.

Amy Salva, vocational expert, testified that plaintiff's past jobs as a paint mixer and hardware assembler were light work. Packager and salvage labor were classified as medium work, but plaintiff performed them at a light level. Plaintiff's past work as a cubing machine operator was classified as heavy work, but he performed it at the light level. Ms. Salva testified in response to a hypothetical question assuming a person who was limited to lifting 20 pounds occasionally and 10 pounds frequently; who could sit for six hours, stand for six hours, and needed to avoid jobs requiring acuity for fine detail. Ms. Salva indicated that plaintiff could perform his past work as a packager, salvage laborer, hardware assembler and cubing machine operator.

The ALJ concluded that plaintiff did not suffer from a listed impairment, but that he had the following severe impairments: mild visual acuity deficits and a history of cardiomyopathy, substantially resolved. He found that plaintiff's depression was

not severe. He noted that plaintiff's mental impairment caused only mild restriction of his daily living activities, social functioning, and concentration, persistence or pace. He found that plaintiff's testimony concerning the severity of his impairments was only partially credible. He determined that plaintiff had the residual functional capacity to perform light work exertion since he could lift up to 20 pounds and 10 pounds frequently, had no limit on sitting, and was able to stand and/or walk 6 hours of an 8-hour work day, and needed to avoid jobs that require acuity for fine detail. He further found that plaintiff was capable of performing his past relevant work as a hand packager, a hardware assembler, a cubing machine tender and a salvage laborer. Accordingly, the ALJ found that plaintiff was not disabled.

IV.

Plaintiff initially contends that the residual functional capacity established by the ALJ is not supported by substantial competent evidence. Plaintiff further argues that the ALJ erred in establishing his residual functional capacity because he ignored the opinion of his treating physician. He suggests that the ALJ did so without providing an adequate basis for doing so.

The court has undertaken a thorough review of the medical evidence as well as the testimony offered at the hearing before the ALJ. This review persuades the court that the ALJ's decision is supported by substantial evidence. Plaintiff does suffer from some

physical and mental impairments, but we do not find that he is disabled by them. The ALJ considered plaintiff's limitations in deciding that he retained the residual functional capacity to perform his past relevant work.

The court finds that the ALJ properly evaluated the credibility of plaintiff. Credibility determinations are peculiarly the province of the finder of fact, and this court will not upset such determinations when supported by substantial evidence." Diaz v. Secretary of Health & Human Services, 898 F.2d 774, 777 (10th Cir. 1990). The ALJ's credibility determinations "warrant particular deference" because "[t]he ALJ enjoys an institutional advantage in making the type of determination at issue here. Not only does an ALJ see far more social security cases than do appellate judges, he or she is uniquely able to observe the demeanor . . . of the claimant in a direct and unmediated fashion." White v. Barnhart, 287 F.3d 903, 910 (10th Cir. 2001). Credibility determinations, however, cannot be based on intangible or intuitive reasons, but "must be grounded in the evidence and articulated in the determination or decision." Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4; see also Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995)(credibility determination "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." (internal quotation marks omitted)).

The ALJ cited several reasons to discount plaintiff's credibility. He noted the following reasons: (1) the objective medical evidence did not support plaintiff's allegations of totally disabling limitations; (2) plaintiff's history of low earnings; (3) plaintiff's lack of motivation to return to the workforce; (4) plaintiff's lack of compliance with his medication regimen; and (5) plaintiff's failure to currently seek treatment. The court cannot say that the ALJ's credibility findings are not supported by substantial evidence.

The court also finds that the ALJ's residual functional capacity determination is supported by substantial evidence. The various determinations made by the ALJ appear to be consistent with the medical evidence in the record as well as plaintiff's description of his daily activities. The ALJ considered the various functional limitations suggested by the doctors who examined plaintiff, including Dr. Richardson, and provided several specific reasons for not following them. The court finds that the ALJ properly discounted or disregarded the residual functional limitation decisions by plaintiff's examining doctors. The court finds there was substantial evidence in the record to support the ALJ's determination that plaintiff could perform his past relevant work.

Finally, the court does not find that the ALJ ignored the opinion of plaintiff's treating physician. Generally, the

14

"treating physician rule" requires the ALJ to give greater weight to the opinions of doctors who have treated the claimant than those who have not. Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005). Moreover, "[t]he ALJ is required to give controlling weight to the opinion of a treating physician as long as the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." Hamlin v. Barnhart, 365 F.3d 1208, 1215 (10th Cir. 2004). If either of these requirements is not met, the ALJ is not required to give the opinion controlling weight but he must still decide whether to reject the opinion altogether or assign it some lesser weight. Pisciotta v. Astrue, 500 F.3d 1074, 1077 (10th Cir. 2007). If he rejects it, the ALJ "must articulate specific, legitimate reasons for his decision." Hamlin, 365 F.3d at 1215 (quotation omitted). And, if he merely assigns it a lesser weight, the ALJ must consider specific regulatory factors in doing so. These include:

> the length and nature of the treatment relationship, frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist.

Id. n. 7.

Dr. Richardson is plaintiff's treating physician. The ALJ gave "little weight" to Dr. Richardson's opinion for several reasons. First, he noted that Dr. Richardson's specialty is family

15

practice, not cardiology. Next, he found that Dr. Richardson's medical source statements concerning plaintiff's functional limitations were contrary to the comments contained in his treatment records that (1) plaintiff should not engage in "strenuous labor, walking, running, lifting," (2) plaintiff's condition had stabilized; and (3) plaintiff could participate in an employment or training program. He found that the opinions concerning plaintiff's abilities were not indicative of an individual with an "improved condition." Finally, he stated that Dr. Richardson's opinions were not well-supported by medically acceptable clinical and laboratory diagnostic techniques and they were inconsistent with other substantial medical and non-medical evidence in the record.

The court believes that the ALJ complied with the aforementioned requirements. His decision shows that he made a fairly comprehensive review of the medical evidence. He cited several reasons for his decision to give Dr. Richardson's opinion on plaintiff's functional limitations "little weight." In sum, we find that the ALJ relied on sufficient evidence in assigning lesser weight to Dr. Richardson's opinion concerning functional limitations.

In sum, the court finds that the decision of the ALJ is supported by substantial evidence. Accordingly, the decision of the ALJ must be affirmed.

**IT IS SO ORDERED.**

Dated this 2nd day of July, 2008 at Topeka, Kansas.

>                s/Richard D. Rogers
>                United States District Judge